IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| GERARDO FELICIANO VÁZQUEZ, GRIZZLY LORNA DE JESUS FELICIANO, GRISOYDA LIZ DE JESÚS FELICIANO, <br><br> Plaintiffs <br><br> v. <br><br> JOSÉ MARÍN LÓPEZ, et al., <br><br> Defendants | CIVIL NO. 12-1409 (FAB) <br><br><br><br><br><br><br><br> *Plaintiffs demand trial by jury* |

## MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

TO THE HONORABLE COURT:

COMES NOW codefendant DR. OSVALDO JIMÉNEZ MERCADO, through its undersigned attorney, who submits this Motion for Summary Judgment and Memorandum of Law which is supported by a separate Statement of Uncontested Material Facts (**SUMF**) filed on this same date, and respectfully **states** and **prays**:

### I. INTRODUCTION

The present civil action was filed against several codefendants, including Dr. Osvaldo Jiménez. Its main argument against Dr. Jiménez is that when he intervened as a consulted cardiologist with the patient, Mrs. Joaquina Vázquez, he only recommended that the patient should be transferred to the Intensive Care Unit and that contributed to the demise of the patient around one or two hours later.

Mrs. Joaquina Vázquez was a 77 year old woman that had undergone a surgical procedure some three days prior to her admission in the Doctor's Center Hospital on August 23, 2009. The surgical procedure was a colostomy that showed symptoms of a failed or incorrect procedure. Plaintiff's own expert witness has declared that on the same day she was

discharged from that surgical procedure, August 21, 2009, the patient had, with all probability, an obstructed colostomy. That obstruction prevented bowel movement, which caused surgical related complications that should have been corrected as soon as the patient got to the Emergency Room of the Doctor's Center Hospital on August 23, 2009.

The patient arrived at the Emergency Room in ambulance around 1:38 A.M. according to the ambulance report, but she was not evaluated by a medical doctor until 3:00 A.M. The emergency room doctor that saw the patient requested that administered IV fluids and several symptom-treating medications. Also, the ER doctor noticed digested blood in the vomit of the patient and blood in the colostomy bag. At that time, 3:00 A.M., a consultation to the on-call internal medicine doctor was placed so he/she could evaluate the patient. Neither a consultation to a surgeon nor a cardiologist was placed by the ER doctor. Furthermore, plaintiff's expert witness declared that if a consultation STAT to a surgeon would have been noted, it would have been probable that the patient could have undergone a corrective surgical procedure early in the afternoon of August 23, 2009 that would have increased her chance of survival. Dr. Ramos, an internal medicine doctor, answered that consultation which had no indication of an emergency or urgent situation; no STAT indication.

Dr. Ramos saw the patient around 11:20 A.M. and noted the patient critically ill. Dr, Ramos ordered a CT scan of the patient and admitted Mrs. Joaquina Vázquez in the hospital. According to the plaintiff's expert witness, Dr. Ramos did not hydrate the patient aggressively enough; causing the patient to become more hypovolemic –low volume of fluids- and causing a cascade of events that deteriorated the patient. Events like having less blood flow to the coronary arteries, less blood flow to the kidneys, less blood flow to the cerebral arteries, less blood flow to the area where the problem seems to be, which was the abdomen. This, according to plaintiff's expert witness, "of course, for the hours the patient will be more

deteriorated as is to be expected." (*Plaintiff's expert witness, Dr. José J. Cerra Díaz's deposition, **pages 35-36***). Up to this moment, Dr. Osvaldo Jiménez had not intervened with the patient.

Dr. Osvaldo Jiménez was called by a nurse or the clerk of Doctor's Center Hospital and informed him of a routine consultation. Again, no indication that this was a STAT consultation was given to Dr. Jiménez. Dr. Jiménez was informed only the name of the patient. Nonetheless, Dr. Jimenez requested additional information such as who was the treating physician, medical plan, and reason for the consultation. After additional inquiries, Dr. Jiménez was informed that the patient had a colostomy and sepsis, but no STAT consultation.

As any reasonable doctor would have done, Dr. Jiménez reviewed all consultations and prioritized according to the emergency. The order of priorities was (1) the ICU patients, (2) all patients who are more critical, and (3) the more stable patients; routine consultations. It is important to repeat and point out that when Dr. Jimenez was called he was not informed of a STAT, emergency, nor urgent situation; not even after inquiring additional information from the caller. Based on the information that was given to him, Dr. Jiménez set a schedule for his consults.

Dr. Jiménez arrived to see the patient around 7:30 P.M. and began reviewing the record for information that typically neither the patient nor the family knows. After doing so, Dr. Jiménez proceeded to see the patient around 8:30 P.M. When he saw the patient she had no hair because of the cancer-related therapies and was lethargic. The patient's daughter was with her and then Dr. Jiménez learned that the patient was related to Dr. Feliciano, the plaintiff in this case. Dr. Jiménez was informed by the patient's daughter of the cancer history. No additional information regarding delays or inadequate treatment of the patient was informed to Dr. Jiménez. Nonetheless, the daughter informed Dr. Jiménez of a possible obstruction related to

the colostomy that was revealed by the CT scan and that they were waiting for a surgeon to evaluate Mrs. Joaquina Vázquez.

By this time, around 8:30 P.M., the patient appeared to be in the last stages of her life. Also, when Dr. Jiménez saw the patient she had signs of an infarction. Nonetheless, no treatment could be provided because every cardiology treatment at that moment was contraindicated. This fact was also confirmed by the plaintiff's expert witness when declaring at his deposition that what Dr. Jimenez could have done would be considered medical malpractice. Dr. Jiménez, after completing his consultation and being the only thing he could do, recommended a transfer to the ICU.

Dr. Jiménez explained in his deposition that he made the recommendation for a transfer to the ICU because he did not know the family and, being that the patient was in an End-of-Life situation, did not know how the family members could react to the moment of death. With this in mind, Dr. Jiménez talked with the patient's daughter and recommended that she got in touch with Dr. Feliciano if he was to see his mother alive. Dr. Osvaldo Jiménez did no see the patient again because she died within two hours of his evaluation.

The appearing party moves this Honorable Court under Rule 56(c) of the Federal Rules of Civil Procedure in order to request the dismissal of the claim against it, as there is no genuine issue of material facts in this case, and thus, it is entitled to judgment as a matter of law. Calero-Cerezo v. United States Department of Justice, 355 F.3d 6 (1st Cir. 2004); Zambrana Marrero v. Suarez-Cruz, 172 F.3d 122 (1st Cir. 1999).

The action filed in this case against Dr. Osvaldo Jiménez is one of alleged medical malpractice. Plaintiffs contend that Dr. Osvaldo Jiménez, a medical doctor with specialty in cardiology and internal medicine, failed to meet the medical standard of care by only recommending that patient Mrs. Joaquina Vázquez be transferred to the Intensive Care Unit

while answering to a consultation requested by the patient's head physician, and that this constitutes a violation of his duty under Article 1802 of the Puerto Rico's Civil Code.

Plaintiffs allege that this Court has jurisdiction pursuant to 28 U.S.C. § 1332 and the venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391(b).

The Statement of Uncontested material Facts (**SUMF)** in support of this Motion for Summary Judgment and Memorandum of Law filed in this same date demonstrate that plaintiffs were unable to support their allegations of medical malpractice against Dr. Osvaldo Jiménez as their expert witness was unable to offer any evidence that the recommendation contributed to the patient's demise. Bear in mind that the treatment given by Dr. Jiménez to Mrs. Joaquina Vázquez is not in issue, but the issue is regarding the fact that the he only recommended, not ordered a transfer to the ICU and that, alleges the plaintiff, was a contributing factor to the patient's demise.

Plaintiffs allege, but have not proven, that Dr. Osvaldo Jiménez deviated from the current medical standard of care by only recommending a transfer to the ICU. Nonetheless, the evidence announced to this date by them as their main source of proof, their expert witness Dr. Cerra Díaz, as required by the jurisprudence in medical malpractice cases, is neither conclusive nor supported by any medical standard separate from the expert witness own impression, and much less establishes any breach of a standard of care from Dr. Osvaldo Jiménez while treating Mrs. Joaquina Vázquez. As such, plaintiffs have failed to prove a causal relationship between the recommendation given by Dr. Osvaldo Jiménez and the alleged damages suffered by plaintiffs. In other words, plaintiffs have not been able to provide the existence of a related standard of care, but in fact the opposite is true, plaintiff's own expert declared that no such standard exists and therefore, Dr. Osvaldo Jiménez did not breach it.

By taking into account this Motion for Summary Judgment and Memorandum of Law supported by the Statement of Uncontested Material, we are certain that this Honorable Court will find that Dr. Osvaldo Jiménez did not breach any standard of care according to the medical standards and that there is no causation between the alleged damages of the plaintiffs and the recommendation of Dr. Jiménez.

In light of the discussion to be presented in this motion and Memorandum of Law, we believe that this Honorable Court will be in position to dismiss all claims against Dr. Osvaldo Jiménez.

## II. APPLICABLE LAW

### A.   Standard for Summary Judgment

1. A summary judgment is "appropriate where there is no genuine issue as to any material fact and the moving party is entitled to the judgment as a matter of law." Fed. R. Civ. P. 56 (c); Estate of Felix Giomard Rivera, et al v. Doctor Susoni Hospital, 288 F. Supp. 2d 161, 163, (2003). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. McCarthy v. Northwest Airlines, 56 F.3d 313, 1995 U.S. App. LEXIS 13295 (1st Cir. Mass. 1995).

2. The intention of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a **genuine need for trial**." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587; 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Del Toro-Pacheco v. Pereira-Castillo, 662 F. Supp. 2d 202, 208 (2009). The "role [of the summary judgment] is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." McCarthy v. Northwest Airlines, *supra* at 314. Furthermore, "the device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving

the parties' time and money, and permitting courts to husband scarce judicial resources. *Id.* at 315.

   3. "Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment." Cruz-Gascot v. HIMA - San Pablo Hosp. Bayamon, 728 F. Supp. 2d 14, 18 (D.P.R. 2010). "For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *Id.* See also Suarez v. Pueblo Int'l., Inc., 229 F.3d 49 (1st Cir. 2000).

   4. "In order for a factual controversy to prevent summary judgment, the contested facts must be 'material' and the dispute must be 'genuine'. 'Material' means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is 'genuine' when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *Id.* See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248; 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

   5. It is well settled that "[t]he mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." *Id.* at 252. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). Cruz-Gascot v. HIMA - San Pablo Hosp. Bayamón, *supra*.

   6. In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing **summary judgment**, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court may safely ignore "**conclusory allegations, improbable inferences, and unsupported**

**speculation**."  Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). (Emphasis added).

### B.    Article 1802 of the Puerto Rico Civil Code and Medical Malpractice

1. In determining whether to grant or deny Codefendant's request for summary judgment, the Court must address the applicable standard in medical malpractice suits.  In a diversity suit, Puerto Rico law is controlling.  Santiago v. Hosp. Cayetano Call y Toste, 260 F. Supp. 2d 373 (1st Cir. 2003).  Article 1802 of the Puerto Rico Civil Code, 31 P.R. Tit. 31 § 5141, governs a physician's liability in a medical malpractice suite.  Cortés-Irizarry v. Corporación Insular de Seguros, 111 F. 3d 184, 189 (1st Cir. 1997).

2. To make out a prima facie case for medical malpractice under the Art. 1802 of the Puerto Rico Civil Code, "a plaintiff must adduce evidence sufficient to establish three elements: (i) the duty owed (i.e., the minimum standard of professional skill and knowledge required in the relevant circumstances), (ii) an act or omission transgressing that duty, and (iii) a sufficient causal nexus between the breach of duty and the harm claimed."  Borges v. Serrano-Isern, 605 F.3d 1 (1st Cir. 2010).  Quoting Cortés-Irizarry, *supra*; Lama v. Borrás, 16 F.3d 473, 478 (1st Cir. 1994); Rolón-Alvarado v. Mun'y of San Juan, 1 F.3d 74, 77 (1st Cir. 1993).

3. "Under this framework, breach of duty is an essential element of a cause of action for malpractice. **To consider whether a breach has been shown, we first must understand the nature of the duty owed**.  Borges v. Serrano-Isern, *supra* at 7.  (Emphasis added).

4. "The general parameters of the duty of care that a physician owes to a patient under Puerto Rico law are uncontroversial. The physician must employ a level of care consistent with that set by the medical profession nationally.  Thus, a cardiologist, like Dr. Jiménez, must use the same level of care that is generally accepted as good practice in the cardiology subspecialty, nationwide." *Id.*

5. Puerto Rico law affords physicians a presumption that they have provided an appropriate level of care. It is the plaintiff's obligation to refute this presumption by adducing evidence sufficient to show both the minimum standard of care required and the physician's failure to achieve "In determining a physician's duty of care, Puerto Rico law has established a universal standard." <u>Torres-Nieves v. Hospital Metropolitano</u>, 998 F. Supp. at 136. Puerto Rico holds health care professionals to a national standard of care. Accordingly, "a physician is expected to possess, and use, that level of knowledge and skill prevalent in his or her specialty *generally,* not simply the knowledge and skill commonly displayed in the community or immediate geographic region where the treatment is administered." <u>Rolón-Alvarado v. Mun'y of San Juan</u>, *supra*. Furthermore, "[d]octors are required to provide 'that [level of care] which, recognizing the modern means of communication and education…meets the professional requirements generally acknowledged by the medical profession." <u>Irizarry v. Corporacion Insular de Seguros</u>, 928 F. Supp. 141, 144 (D.P.R. 1996); see also, <u>Oliveros v. Abreu</u>, 1 P.R. Offic. Trans. 293, 101 P.R. Dec. 209, 226 (1973)".

6. "The Court is clear that Puerto Rican tort law does not hold a doctor to a "standard of perfection nor makes him an insurer of his patient's well-being. **Only when a physician has failed to comply with the basic norms comprised in the national standard of care may he be held liable for medical malpractice**." <u>Santiago v. Hosp. Cayetano Call y Toste</u>, *supra* at 382. (Emphasis added).

### III. LAW APPLIED TO THE FACTS

1. Dr. Gerardo Feliciano, Grizzly Lorna De Jesús Feliciano and Grisoyda Liz De Jesús Feliciano, the plaintiffs, are the son and granddaughters, respectively, of Mrs. Joaquina Vázquez, the patient. Mrs. Joaquina Vázquez was discharged on August 21, 2009 after having undergone a surgery. On that same date, she showed symptoms consistent with a failed

colostomy. These symptoms were the main cause for her daughter to decide to return to Doctor's Center Hospital with the patient in search of additional medical care. (**SUMF ¶ 1**).

2. Before August 23, 2009, Mrs. Joaquina Vázquez had never been evaluated by Dr. Osvaldo Jiménez nor had he met her. No professional relationship, such as doctor-patient, between Dr. Osvaldo Jiménez and Joaquina Vázquez had existed. (**SUMF ¶ 2**). Dr. Jimenez's intervention in this case was as a result of him covering for a group of doctors on that weekend.

3. Joaquina Vázquez arrived at around 1:38 A.M. at the Emergency Room of Doctor's Center Hospital, continuing to show symptoms of a failed colostomy such as vomiting digested blood. (**SUMF ¶ 3**). Neither a consultation to a cardiologist nor a consultation to a surgeon was ordered at that time. (**SUMF ¶ 4**). Nonetheless, a consultation to an internal medicine doctor was placed. Answering this consultation request, Dr. Ramos, an internal medicine doctor, evaluated Mrs. Joaquina Vázquez around 11:20 A.M. of August 23, 2009. (**SUMF ¶ 5**).

4. According to the plaintiff's own expert witness, the treatment given to Mrs. Joaquina by Dr. Ramos did not comply with the standard of practice **and this caused a cascade of events that deteriorated the patient**. (**SUMF ¶ 6**). Events like having less blood flow to the coronary arteries, less blood flow to the kidneys, less blood flow to the cerebral arteries, less blood flow to the area where the problem seems to be, which was the abdomen. This, according to plaintiff's expert witness, "of course, for the hours <u>the patient will be more deteriorated as is to be expected</u>." (Emphasis added). It is clear that the foregoing represents the adequate causal nexus essential for a plaintiff to make out a prima facie case of medical malpractice under Art. 1802 of the Puerto Rico Civil Code. <u>Borges v. Serrano-Isern</u>, *supra*.

5. It is at this time that Dr. Ramos admitted the patient **and placed a routine consultation** for a cardiologist. (**SUMF ¶ 7**). No indication or notice to the consulted cardiologist of a STAT consultation was noted on the record. (**SUMF ¶ 8**). Without the

knowledge of the real condition of the patient, it is unreasonable to think that someone would assume the worst case scenario for a patient. Specially when in Puerto Rico there exists a *juris tantum* presumption that physicians provide adequate care to their patients. Torres-Nieves v. Hospital Metropolitano, *supra*.

     6. Dr. Osvaldo Jiménez was contacted via phone by a nurse or a clerk in relation to the consultation placed by Dr. Ramos informing Dr. Jiménez of the patients name and that she had a colostomy and septicemia. (**SUMF ¶ 9**). On this phone call no indication of an emergency situation was transmitted to Dr. Jimenez nor was he informed that the consultation was STAT. It is a fact that by this time, according to the plaintiff's own expert witness, the correct procedure to treat Mrs. Joaquina Vázquez was to order a consultation STAT, however, no evidence of a STAT consultation can be obtained from the record. (**SUMF ¶ 10**). It is another fact that during the afternoon, the patient kept deteriorating. (**SUMF ¶ 11**). Again, without knowledge or indication of an emergency situation, how could Dr. Jiménez assume the worst case scenario? How any physician in the world could be able to adequately prioritize the consultations when each and every one, according to the plaintiff's reasoning, must be considered as a STAT consultation no matter what? That reasoning would render the medical profession impractical.

     7. Dr. Ramos had ordered a CT scan of the patient. The results of that CT scan revealed that a surgical procedure, not a transfer to the Intensive Care Unit (ICU) was the first line of treatment. (**SUMF ¶ 12**). Up to this time, Dr. Osvaldo Jiménez had not intervened with Mrs. Joaquina Vázquez since he was making consultation to the ICU of other hospitals, prioritizing those consultations over the routine consultations. Dr. Osvaldo Jiménez did not intervene with Joaquina Vázquez until 7:30 P.M. when he started reviewing the medical record of the patient. (**SUMF ¶ 13**). Up to this moment, no breach of standard can be attributed to Dr. Osvaldo Jiménez just on the fact that he had not treated the patient. On the other hand, there

can be identified a breach of standard from all the physicians that had treated Mrs. Joaquina until this moment, including the breached that caused "a cascade of events that deteriorated the patient. (**SUMF ¶ 6**).

    8. It is a fact that the place to which the treating doctor should have taken this patient was to the Surgery Room rather than the ICU. (**SUMF ¶ 14**). The plaintiff's own expert witness agreed with this statement in his deposition. This is so because the problem that caused all complication in this patient can be traced to the colostomy performed on the patient several days prior to her admission on August 23, 2009 by Dr. Ramos. Therefore, the complications presented by the patient could only be treated via a surgical procedure and a transfer to the ICU would have not changed the outcome.

    9. When Dr. Osvaldo Jiménez evaluated the patient, he saw a very ill person and that patient was lethargic. Dr. Jiménez was informed of the medical history of the patient by her own daughter, who was with her at that time. (**SUMF ¶ 15**). The patient was in an End-of-Life situation or at the final stage of her life. (**SUMF ¶ 16**). Dr. Osvaldo Jiménez, after evaluating the patient and considering her medical history, found a patient in a very poor condition; terminal event. (**SUMF ¶ 17**). At that time, Dr. Jimenez had his hands tied because there was nothing he could do to treat the patient. The treatment that could have done was contraindicated. It is a fact that Dr. Jiménez saw Dr. Ramos, the admitting physician who was in charge of the patient, and informed him of the situation. (**SUMF ¶ 18**).

    10. It is a fact that Plaintiff's expert witness did not know, at the time he concluded his second (2nd) report, what was the standard for transferring a patient to the ICU of Doctor's Center Hospital because he never reviewed the bylaws regarding the ICU of the hospital. (**SUMF ¶ 19**). This reveals that at the time the plaintiff's expert witness reported his conclusions, he had no knowledge of the existence of a standard of care related to the transfer

of another physician's patient to the ICU. The foregoing raises the question; if there is no standard of care, how can there be a breach of that standard?

11. It is a fact that in order to transfer a patient from a room to the ICU the doctor ordering such transfer must comply with all the procedures for a hospital transfer. (**SUMF ¶ 20**). This is so because a physician that transfers a patient to the ICU must inform the ICU of every medication, medical treatment, known medical history, among other things, of the transferring patient. This is information only a head treating physician, not a consulting physician, can know.

12. It is a fact that the standard for transferring a patient to an ICU varies from hospital to hospital and there is no such thing as a standard of care applicable to all institutions. (**SUMF ¶ 21**). In other words, there is no standard governing the argument of the plaintiffs. This is the main error from the plaintiff's argument. "[A] breach of duty is an essential element of a cause of action for malpractice. **To consider whether a breach has been shown, we first must understand the nature of the duty owed**. Borges v. Serrano-Isern, *supra* at 7. (Emphasis added). Put another way, without a generally accepted standard, physicians can performed based on their best knowledge. Plaintiffs rely only on an assumption made by their expert witness based on his personal opinion. "[A] physician is expected to possess, and use, that level of **knowledge and skill prevalent** in his or her specialty *generally,* **not simply the knowledge and skill commonly displayed in the community or immediate geographic region where the treatment is administered**." Rolón-Alvarado v. Mun'y of San Juan, *supra*. (Emphasis added).

13. It is a fact, admitted by the plaintiff's expert witness that Dr. Osvaldo Jiménez did not breach a standard of care by only recommending a transfer to the ICU because such standard of care requiring an "order" to transfer another admitting physician's patient does not exist. (**SUMF ¶ 22**). This admission alone dissolves plaintiff's arguments against the alleged breach

of duty from Dr. Osvaldo Jiménez.  As stated before in this Memorandum of Law, "**[t]o consider whether a breach has been shown, we first must understand the nature of the duty owed**." Borges v. Serrano-Isern, *supra* at 7.

14. Plaintiff's own expert witness recognizes that every treatment that Dr. Osvaldo Jiménez could have done was contraindicated; too risky.  (**SUMF ¶ 23**).  The questions in this case are: if the treatment was contraindicated, how could Dr. Jiménez had done anything? If Dr. Jiménez was consulted, how can his recommendation be a causing factor to the demise of the patient when it was not followed by the admitting and head physician of the patient?  From where does a duty to kidnap another doctor's patient and order a transfer to another ward without the knowledge of the head physician when there is no standard for such procedure?  It is clear that Plaintiffs have failed to offer proof or supporting evidence that could help answer these questions.  In fact, the **Plaintiff's own expert witness recognizes that he has no medical evidence arising from the record or any medical literature in support of his theory that the patient's demised was caused by the lack of transfer to the ICU**.  (**SUMF ¶ 24).**  Finally, Plaintiff's expert witness report fails to support the expert witness conclusion of a deviation from the standard of care by Dr. Osvaldo Jiménez and only reflects his personal opinion of what he would have done, even though he is not a cardiologist and has never been trained as a cardiologist.  (**SUMF ¶ 25**).

## IV. CONCLUSION

1. Based on all of the foregoing, there must be no doubt that the Plaintiffs failed to offer proof or supporting evidence that Dr. Osvaldo Jimenez intervention with Mrs. Joaquina Vázquez contributed to her demise.  Plaintiffs also failed to offer proof of the existence of a standard of

care related to the transfer to an ICU by a consulting physician without the knowledge or consent of the head or admitting physician of a patient.  Lastly, Plaintiffs only rely for their argument on the personal assumption of their expert witness and not on any identifiable standard of care generally accepted by the profession.  The above demonstrates that plaintiffs have not complied with the burden of demonstrating the basic norms of knowledge and medical care applicable to the case, failing to rebut the presumption that Dr. Osvaldo Jiménez treated Mrs. Joaquina Vázquez according to the best medical practice and standard of care available; which in fact he did.

**WHEREFORE** it is respectfully requested that this Honorable Court enter summary judgment in favor of the codefendant, Dr. Osvaldo Jiménez and dismiss the actions against him with any other remedies that this Honorable Court may deem just and appropriate.

**RESPECTFULLY SUBMITTED.**

I HEREBY CERTIFY that on this same date I presented the foregoing Statement of Uncontested Material Facts to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filling to all attorneys on record.

**In San Juan, Puerto Rico, this February 4, 2013.**

<u>**S/ JAIME E. MORALES-MORALES**</u>
JAIME E. MORALES-MORALES (129006)

**MORALES-MORALES LAW OFFICES**
URB. TOWN PARK
MARGINAL 181, A-1
SAN JUAN, PR  00924

TEL. 787-755-1570 / FAX: 787-755-1571

E-Mail: jmorales@moralesmorales.com